[Crim. No. 16387. In Bank. Apr. 2, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR GLICK KUNKIN et al., Defendants and Appellants.

COUNSEL

H. Peter Young, Albaum & King, Walter H. King and Mel Albaum for Defendants and Appellants.

Norman G. Rudman, Lionel S. Sobel and Walter L. M. Lorimer as Amici Curiae on behalf of Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James and S. Clark Moore, Assistant Attorneys General, Ronald M. George and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—The Los Angeles Free Press (Free Press), its editor and owner, Arthur Glick Kunkin, and its reporter, Gerald Robert Applebaum, were each indicted on two counts of receiving stolen property (Pen. Code, § 496)[1] for allegedly taking possession of two documents which had been removed from the Los Angeles office of the Attorney General by Jerry M. Reznick.[2] At trial, after the close of the prosecution's case, the court on

---

[1]Unless otherwise indicated, all section citations refer to the Penal Code.

[2]Reznick was tried separately and found guilty on two counts of violation of Goverment Code section 6201 (theft or removal of government records). He is not a party to the present action.

defense motion acquitted Free Press and Kunkin on the count pertaining to one of the documents. (See § 1118.1.) The related charge against Applebaum for receipt of the same document was dismissed with the prosecutor's consent after the jury was unable to agree on a verdict as to that count. (See § 1385.) The jury found each defendant guilty of one count of receiving stolen property, and defendants appeal from the judgment entered as to the Free Press and the orders granting probation to Kunkin and Applebaum. For reasons hereinafter set forth, we conclude that there was no substantial evidence to support one of the essential elements of the crime of receiving stolen property and, accordingly, we reverse the judgment.

While Jerry Reznick was employed as a mail clerk at the Los Angeles office of the Attorney General he removed a copy[3] of a personnel roster of the Bureau of Narcotic Enforcement[4] which listed the names, home addresses and home telephone numbers of undercover narcotics agents throughout the state. It was not marked "secret" or "confidential." The copy of such document constitutes the "property" found by the jury to have been received by defendants.[5]

Reznick took the roster to the office of the Free Press where he met Applebaum. Reznick asked Applebaum whether the Free Press would publish the roster and Applebaum replied that he did not know. Although Applebaum feared "there might be trouble" if such a document were published, he said that he would nevertheless consult his editor. When Reznick asked if he would be paid for providing the roster, Applebaum explained that, subject to approval by his superiors, the standard fee paid for information actually used in an article was $20. Reznick then departed.

Reznick returned a week later with the roster. Although Applebaum still could not promise that the Free Press would publish the roster, Reznick left the document on the reporter's desk and insisted that the newspaper not reveal its source of information. No agent of the newspaper promised to pay for the roster and Reznick was never paid for it.

On August 8, 1969, the Free Press published the roster verbatim in its feature article. The following headlines, inter alia, accompanied the article:

[3]The copy had apparently been made on the Attorney General's duplicating machine.

[4]The bureau is under the supervision and control of the Attorney General.

[5]Reznick also removed and delivered to defendants a copy of a report marked "secret" on an investigation into charges that various members of the campus police at the University of California at Los Angeles had acted unlawfully and were performing their duties incompetently. As stated, charges relating to the receipt of that document were resolved favorably to defendants.

"Narcotics Agents Listed," "There should be no secret police," and "Know your local Narc." The text editorialized that police personnel should live openly in the community which they serve.[6] On an ensuing television interview, Kunkin acknowledged his role in publishing the list and stated that he was satisfied as to its authenticity. He explained that the roster was appended to the editorial "for dramatic effect."

After the list was published, Reznick went to Applebaum and asked for the return of the copy of the roster he had provided. Applebaum refused but assured Reznick that the document was locked in a safe place. Following requests made by a deputy attorney general to the Free Press, an attorney of undetermined authorization delivered the copy of the roster to the Attorney General's office. Fingerprints of Reznick, Applebaum and Kunkin were found on the document.

Section 496 provides in subdivision 1: "Every person who buys or receives any property which has been stolen or which has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, withholds or aids in concealing or withholding any such property from the owner, knowing the property to be so stolen or obtained, is punishable by imprisonment. . . ."

■ A conviction for receiving stolen property cannot withstand appellate scrutiny unless substantial evidence was presented to the trier of fact that (1) the property was received, concealed, or withheld by the accused; (2) such property had been obtained by theft or extortion; and (3) the accused knew that the property had been so obtained. (*People* v. *Scaggs* (1957) 153 Cal.App.2d 339, 352 [314 P.2d 793].)

We will assume, without deciding, that one of the several copies of the roster of personnel of the bureau distributed to the Los Angeles office of the Attorney General was "property" within the meaning and intended scope of section 496. We will also assume, without deciding, that the receipt of the roster by defendants was a "receiving" of property within the meaning and intended scope of section 496. Our discussion will focus

---

[6]Selected portions of the text stated: "Secret police forces are a threat to democratic government. History demonstrates that the secret policeman invariably uses his anonymity to become unaccountable to the people over whom power is exercised. [¶] Recently there have been published stories of abuses of power involving narcotics officers. Several officers of many years standing have even been discharged for faking evidence. [¶] Many, if not most narcotics cases are thrown out of court because the officers have violated the constitutional rights of the suspect in conducting illegal searches and seizures. [¶] But the public at large does not ordinarily hear of the violations of law committed by these secret policemen who are attempting to enforce laws as unwise and unenforceable as the now banished prohibition of liquor."

on the evidence adduced at trial to prove the latter two elements of the crime of receiving: the received property's stolen status and the receiver's knowledge of this status.

The substantial evidence rule has received extended discussion and express reaffirmation in several of our recent cases. In *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659], we observed that "this court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. . . . The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt."

In *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649], we emphasized that reasonableness was the ultimate standard under the substantial evidence rule. "The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt." When unsubstantial circumstantial evidence is urged in support of an inference of guilty knowledge, we have not hesitated to find that evidence insufficient. (See *People* v. *Williams* (1971) 5 Cal.3d 211, 215-217 [95 Cal.Rptr. 530, 485 P.2d 1146].) "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) The substantial evidence rule mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact. "[I]n determining whether the record is sufficient . . . the appellate court can give credit only to 'substantial evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value.' " (*People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].)

■ Section 496 applies to the receipt of "any property which has been stolen or which has been obtained in any manner constituting theft or extortion." This broad language is intended to include property which has been obtained not only by theft by larceny (i.e., stealing) but also by such other forms of theft as embezzlement.[7] We note at the outset,

---

[7] Prior to 1951 section 496 applied only to stolen goods and required the receiver to have a specific intent either to benefit himself or to deprive the rightful owner of

however, that the jury in this case was instructed on the elements of theft by larceny only. Thus even though section 496 applies by its terms to the receipt of property obtained by embezzlement, the convictions below could only have been predicated on the jury's finding that the roster was stolen, not embezzled. ■ We, of course, cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule. (See *People* v. *Montalvo* (1971) 4 Cal.3d 328, 335-336 [93 Cal.Rptr. 581, 482 P.2d 205].) The immediate question, accordingly, is whether there is substantial evidence that Reznick committed a theft by larceny apart from the suggestion that, because of his employment, he might have committed theft by embezzlement.[8]

■ It has been settled for at least 78 years that theft by larceny requires a specific intent permanently to deprive the rightful owner of his property. "While the felonious intent of the party taking need not necessarily be an intention to convert the property to his own use, still it must in all cases be an intent to wholly and permanently deprive the owner thereof." *(People* v. *Brown* (1894) 105 Cal. 66, 69 [38 P. 518]; see also 1 Witkin, Cal. Crimes (1963) § 384, p. 358.)[9]

There is scant evidence in the instant case that Reznick intended a permanent deprivation. In the typical case the thief's sale of the property is persuasive proof of such an intention, but one of the many distinctive features of this case is that the alleged receiving involved no sale, at least of the stolen item itself. Reznick did leave the roster with defendants in the expectation that he would receive $20 should the roster result in a

---

his property. Embezzlement is a recognized form of theft within the meaning of section 496. (See *People* v. *Dolbeer* (1963) 214 Cal.App.2d 619 [29 Cal.Rptr. 573].)

[8]The legal distinction between stealing and merely taking has had important ramifications in the application of criminal law to common forms of conduct. Receiving statutes similar to the predecessor to section 496 which applied by their terms solely to the receipt of stolen (i.e., theft by larceny) property were occasionally held inapplicable to property obtained by means other than larceny. *(Commonwealth* v. *Leonard* (1886) 140 Mass. 473 [4 N.E. 96]; *State* v. *Gennusa* (1914) 258 Mo. 273 [167 S.W. 439]; *Gentry* v. *State* (1945) 223 Ind. 459 [61 N.E.2d 641]. The original section 496 dated from 1872. The broader provision in effect today was added in 1935 as section 496bb. In 1951 old section 496 was repealed and section 496bb was renumbered section 496.) The specific intent requisite for larceny also served to frustrate many prosecutions for auto theft, until special "joy-riding" statutes were passed adding presumptions as to intent or creating a special statutory auto theft offense for which no specific intent need be shown. (See the cases collected at 7 Am.Jur.2d, Automobiles and Highway Traffic, §§ 303-304; Annot., Automobiles: Elements of Offenses Defined in "Joyriding" Statutes (1966) 9 A.L.R.3d 633.)

[9]The substance of this requirement of proof of the specific intent of the perpetrator of the alleged larceny whose fruits were received by defendants was incoprporated in the instructions given to the jury in this case. (CALJIC Nos. 14.02 and 14.03.)

published story, but Reznick insisted in all his dealings with defendants that the roster be returned to him after they had made whatever use they cared to of the information it contained. By Reznick's uncontradicted testimony, defendants never offered to pay money for the roster or for the information it contained, nor did they actually pay Reznick any money. Thus nothing inherent in the transaction itself bears a necessary or even likely inference that Reznick intended to keep the roster away from the office of the Attorney General permanently.

It appears, however, that after Reznick testified that he had only caused the roster "to be removed," he answered in the affirmative, over objection, a prosecution question whether he had stolen it.[10] We have heretofore recognized that words of common usage do not necessarily reflect the subtle distinctions they bear before bench and bar. (See *People* v. *Montarial* (1898) 120 Cal. 691, 694-695 [53 P. 355].) ■ Thus an affirmative answer to a leading question whether the witness stole something, when that witness himself has characterized the taking as a removal, is not dispositive of the issue whether the removal was accompanied by a specific intent to steal, that is, to remove permanently. (Cf. *People* v. *Clausen* (1898) 120 Cal. 381 [52 P. 658].)

Were there no more evidence in the record than Reznick's acquiescence in the use of the word "steal," and his account of his tender of the roster to defendants with simultaneous insistence that it be returned to him, we would deem excruciatingly close the question whether there was substantial evidence in support of the jury's finding that the roster was stolen property. A final item of evidence convinces us, however, that there was

---

[10]Reznick testified as follows on direct examination:
"Q. In the course of your work as a mail clerk did you sort incoming mail as well as the outgoing mail that you previously mentioned?
"A. I did.
"Q. And was it while you were performing that function that you came across this [roster] in the mail room?
"A. No. That was a little later.
"Q. Where was it that you saw it?
"A. It was in the mail room.
"Q. Now, did you steal this document?
"A. I caused it to be removed, yes.
"Q. You caused it to be removed from the office of the Attorney General?
"A. I did.
"Q. And did you steal it?
"A. Yes."
Just prior to using the word "steal" in relation to Reznick's taking of the roster, the prosecution had used the same leading question in relation to Reznick's taking of the other document from the office of the Attorney General. At that time counsel for defendants objected on the ground that the question called for a legal conclusion and were overruled on the ground that "steal" was a word of common usage.

sufficient circumstantial evidence for the finder of fact to reasonably draw the inference that Reznick took the roster with intent to steal. ■ This dispositive circumstance is that Reznick had in fact ceased working for the office of the Attorney General at the time of his tender of the roster to defendants. Thus he was no longer in a position conveniently to return the roster to the office following its perusal by defendants. We thus conclude that there is substantial evidence in support of the finding that the property was stolen.

We turn now to the question whether there is also substantial evidence from which the jury could reasonably have drawn an inference that defendants knew the roster was stolen when Reznick tendered it to them.

Crucial to consideration of this question is the fact that defendants were not made aware by Reznick that he was no longer employed by the office of the Attorney General.[11]

---

[11]Reznick's relevant testimony on direct examination was as follows:

"Q. Now, getting back to the transaction which you described between you and defendant Applebaum, what exactly did you say to defendant Applebaum about your employment?

"A. Nothing more, I recall, than the fact that I did work at the Attorney General's office.

"Q. When you say 'did work,' did you tell him that you had worked or that you were still working?

"A. I believe I used the language 'I worked.' I don't—

"Q. The past tense?

"[Counsel for defendants]: Let him finish.

"A. Well, I dont think I put it in the past tense or the present. I mean 'I worked,' is an ambiguous way, but—

"Q. Those are the exact words as best you remember them, 'I worked'?

"A. Yes.

"Q. Do you remember what time of day it was that you met with defendant Applebaum?

"A. The afternoon.

"Q. Early afternoon or—do you remember the time—or late afternoon?

"A. It would have been later afternoon.

"Q. Now, when you said you worked, did you indicate what capacity?

"You were telling us something about that Thursday.

"A. Yes. I mentioned that I may have said in passing where I worked, in what capacity, as a clerk.

"Q. As a mail clerk, is that correct?

"A. Well, I thought that over, and chances are I didn't say 'mail.' I never referred to myself as a mail clerk, because my position was as a clerk.

"Q. In other words, you didn't say you worked in a legal capacity, did you?

"A. Well, there was not really any discussion on capacity beyond my mentioning—beyond my mentioning my position once, perhaps.

"Q. That is to say there was no inquiry by Mr. Applebaum beyond what you said, is that correct?

"A. Correct.

Besides misleading defendants about his employment status, Reznick maintained throughout his conversations with defendants that he was giving them a roster to look at only.[12]

Where the only testimony bearing on the issue is uncontradicted and negates guilty knowledge, even though it is the testimony of the defendant, a conviction of receiving stolen goods must be reversed for insufficiency of the evidence. (*People* v. *Jolley* (1939) 35 Cal.App.2d 159, 163 [94 P.2d 1011].) Although guilty knowledge may be proven by circumstantial evidence (see *People* v. *Juehling* (1935) 10 Cal.App.2d 527, 531-532 [52 P.2d 520]; *People* v. *Boyden* (1953) 116 Cal.App.2d 278, 287-288 [253 P.2d 773]) when challenged on appeal those circumstances must be shown to constitute substantial evidence.

The Attorney General has offered us seven circumstances which he submits establish defendants' knowledge that the roster was stolen.[13] The

---

" . . . . . . . . . . .
"Q. All right, Mr. Reznick, could you please repeat to us the entire conversation you had with Mr. Applebaum on the first occasion?
" . . . . . . . . . .
"A. We greeted each other, he introduced himself, I introduced myself, we sat down in his office.
" . . . . . . . . . . .
"There was somehow or other, I'm not sure of the words, how the words came out, there was an understanding that there is a $20.00 fee for articles, but this would have to be approved, he could not ascertain whether this would be done or not.
"At one point he asked me how I came across this information, and I said I worked at the Attorney General's office.
" . . . . . . . . . . .
"Q. In what capacity, as a clerk?
"A. Like I said, I may have said as a clerk."
[12]Reznick testified: "I offered to see whether he wanted to use the information in there for an article in his paper."
Reznick's insistence on his continuing control over the documents was further explored on cross-examination:
"Q. You never intended to relinquish any document you brought in there, isn't that correct?
"A. That's correct.
"Q. You were just showing the document, isn't that right?
"A. True.
"Q. And you wanted the document back?
"A. That's correct.
"Q. In fact you insisted on having it back, isn't that right?
"A. Yes, I asked for it back.
"Q. And [this pertains to] the roster of personnel, correct?
"A. Correct.
"Q. You were showing information, you were never giving up that document, is that correct?
"A. That's correct."
[13]Each of these circumstances is far more indicative of an unauthorized release by Reznick of information lawfully possessed, than it is indicative of defendants'

sensitive nature of the information, Reznick's appearance and desire to remain anonymous, defendants' awareness that the publication might cause trouble, defendants' willingness to pay a small sum for the roster and refusal to surrender the same, all circumstances upon which the People rely to support inferences that defendants knew the roster was stolen, are apt illustrations of the type of *insubstantial* evidence which is insufficient to sustain a conviction. (See *People* v. *Bassett, supra,* 69 Cal.2d 122, 139.)

The Attorney General's list of suspicious circumstances confuses circumstances which might well serve to put a publisher on notice that official displeasure would result from publication of information released to him without authorization, with circumstances which should signal that the property tendered has been taken by theft by larceny. The sensitive nature of the information contained in the roster, although just cause for outrage at defendants' gross and callous irresponsibility in publishing it, gives no basis for presuming that defendants knew Reznick took the roster with an intent to steal. Whatever the inferences which might reasonably be drawn from the physical appearance of one who purports to hand over a list of undercover narcotics agents and his wish to remain anonymous, the fact that the list was obtained through theft is not such an inference. Recognition that the publication may cause trouble is so apparent for reasons other than a possible theft, that no permissible inference of theft may be drawn therefrom. Defendants' willingness to pay for the information is likewise without significance, as they were apparently willing to pay similar amounts for information whether lawfully or unlawfully come by. We are unable to discern any knowledge of the theft of the roster by defendants' initial refusal to surrender the roster after its publication.

██ Since Reznick's testimony regarding his failure to inform defendants that he had ceased to work for the Attorney General and his insistence that the roster be returned was uncontradicted, and since the suspicious circumstances relied upon by the People will not in the peculiar circumstances of this case support an inference of guilty knowledge that the roster

---

guilty knowledge that the roster was stolen. These seven circumstances are: (1) defendants' receipt of a document other than the roster which document contained language indicating it was internal correspondence, and which document was referred to as a "secret" document when published by defendants; (2) the very nature of the roster in question; (3) "the physical appearance of the person from whom they obtained the roster (Reznick) and his very apparent lack of authority to transmit the roster to them"; (4) Reznick's request that his identity not be revealed by defendants; (5) defendant Applebaum's initial hesitation to accept the roster due to concern that publication of it might cause trouble; (6) defendants' apparent willingness to pay $20 for documents which if available to the public would be nominally priced; and (7) Applebaum's post-publication refusal to return the roster to Reznick, with the statement that the roster was "locked up in a safe place."

had been stolen,[14] we conclude that there was no substantial evidence to support the jury's finding that defendants knew the roster was stolen.

The judgment and orders granting probation are reversed.

McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied May 2, 1973, and the opinion and the judgment were modified to read as printed above.

---

[14]We note that we in no way condone the conduct of Reznick in making available to defendants the roster and in subjecting the officers listed thereon and their families to the possibility of danger. We further note that in recognition of the tortuous reasoning imposed upon prosecutor and courts in fitting journalistic conduct to the elements of a receiving statute in these or similar circumstances, the Legislature has, while this action was pending, provided criminal sanctions against malicious disclosures of the nature here involved. (§ 146e.)