KENNARD, J.,*
Concurring and Dissenting.—I concur in the majority opinion except in one respect: As to defendant Loi Tan Vo, the evidence is, in *1259 my view, insufficient to support the jury’s torture findings. I would therefore reverse, as to Vo, the jury’s true finding on the torture-murder special-circumstance allegation (Pen. Code, § 190.2, subd. (a)(18)) and set aside the judgment of death as to Vo. I further conclude that there is insufficient evidence to convict Vo of first degree murder on a torture-murder theory, although I agree with the majority that Vo’s first degree murder conviction can be upheld on the theory of deliberate and premeditated murder.
L
Defendants Hajek and Vo, who were both 18 years old, devised a scheme to go to the home of 16-year-old Ellen Wang (with whom Hajek had been arguing), to kill Ellen’s family while she watched, and then to kill Ellen. Hajek announced his intention in advance to an acquaintance. On January 18, 1991, Hajek and Vo arrived at the Wang residence about 10:00 a.m. They had gloves and a pellet gun. Inside the home were Ellen’s 10-year-old sister, Alice, and her 73-year-old grandmother, Su Hung.
Hajek and Vo used a ruse to enter the Wang home. Once inside, Hajek pointed the pellet gun at Alice, and Vo tied Su Hung’s hands behind her back and took her upstairs. Hajek guarded Alice as she watched television downstairs. At one point, Hajek took Alice to an upstairs bathroom and left her there. Vo later took Alice back downstairs, and Hajek followed after about 10 minutes. Eventually, Alice’s mother, Cary, arrived. Vo took a knife from the kitchen and hid in a downstairs bathroom. When Cary entered the house, Vo emerged from hiding and threatened Cary with the knife. He told her that if she screamed, he would kill the family. Cary cooperated, and Vo later returned the knife to the kitchen.
Defendant Vo then took Cary to Ellen’s school in an effort to find Ellen. Cary persuaded Vo to stop at Cary’s office, where Cary managed to tell someone to call the police. While Cary was out with Vo, Ellen’s father, Tony, came home and found defendant Hajek downstairs with young Alice. Alice told her father that Hajek had a gun. When Cary and Vo returned, Vo and Hajek detained the entire group. During that time, each defendant went upstairs, separately, many times. On two occasions (once before Tony arrived, and once after), Hajek took Alice upstairs to see her grandmother. The first time this occurred, however, Hajek went upstairs alone before taking Alice upstairs. Alice could not get a clear look at her grandmother on either occasion, but she thought her grandmother was reading a newspaper or sleeping.
When police officers arrived, they arrested both Hajek and Vo. Su Hung’s dead body was found in an upstairs bedroom, her hands tied behind her back *1260 and her mouth gagged. She had been strangled with a cord, and there was a three-quarter-inch-deep and three-and-a-half-inch-long slash across her throat. An autopsy revealed burst blood vessels in her face, indicating that she was strangled slowly before her throat was slashed. The jugular vein on the right side of her neck was partly severed. The doctor who performed the autopsy concluded, from the large amount of blood, that Su Hung was alive when her jugular vein was severed. Su Hung also had a one-inch-deep and one-inch-long stab wound on her shoulder and five superficial cuts on her chest. The stab wound on her shoulder was inflicted before death, and the superficial cuts could have been inflicted before death. The autopsy doctor could not determine whether the strangulation had rendered Su Hung unconscious before infliction of the cuts, the stab wound, and the throat slash.
Blood found on a glove used by defendant Hajek was consistent with Su Hung’s blood. There was also blood on Hajek’s jacket, although the source could not be determined. There was no blood on Vo or on any of his clothing. A knife found in a puddle of water in the kitchen sink tested positive for blood, but the tests could not rule out an animal source.
H.
“ ‘In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we “examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.” [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [f] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] “[I]f the circumstances reasonably justify the jury’s findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.” [Citation.] We do not reweigh evidence or reevaluate a witness’s credibility.’ [Citation.]” (People v. Houston (2012) 54 Cal.4th 1186, 1215 [144 Cal.Rptr.3d 716, 281 P.3d 799].)
“To prove torture murder, the prosecution must establish ‘ “a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.” ’ [Citation.] To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citation.] The jury may *1261 infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim’s body. [Citation.]” (People v. Streeter (2012) 54 Cal.4th 205, 237 [142 Cal.Rptr.3d 481, 278 P.3d 754] (Streeter).) In addition, “the trier of fact may find intent to torture based on all the circumstances surrounding the charged crime, including the nature and severity of the victim’s wounds and any statements by the defendant revealing his state of mind during the crime.” (People v. Bemore (2000) 22 Cal.4th 809, 841 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)
III.
As discussed above, to prove torture murder or the torture-murder special circumstance, the prosecution must establish “intent to cause extreme pain or suffering.” (Streeter, supra, 54 Cal.4th at p. 237.) Here, there is no evidence of such intent other than the nature of Su Hung’s injuries. At trial, the evidence describing those injuries was sufficient to allow the jury to reasonably infer that whoever had inflicted the injuries intended to cause extreme pain, and therefore the jury’s torture findings can be upheld only as to that person (or those persons). The evidence, however, is weak as to the identity of that person (or those persons). Defendants Hajek and Vo could have inflicted the wounds together, while Su Hung’s 10-year-old granddaughter Alice was in the upstairs bathroom, or one defendant could have inflicted the wounds alone, while the other was watching Alice, or the wounds could have been inflicted at different points in time, some by Vo and others by Hajek.
That defendant Hajek went upstairs before bringing Alice upstairs to see Su Hung could support the inference that Hajek knew Su Hung was injured and he wanted to make it appear to Alice as if Su Hung were fine. The same evidence, however, also suggests that Su Hung’s throat had not, at that point, been slashed, as crime scene photos show that the partial severing of Su Hung’s jugular vein produced a tremendous amount of blood that Hajek could not easily have concealed from Alice. Alice’s testimony that her grandmother appeared to be reading the newspaper or sleeping also supports the conclusion that Su Hung’s throat had not been cut when Alice saw her, for Alice surely would not have described her grandmother in such innocuous terms if she had seen large amounts of blood. Although Alice’s statement that her grandmother was sleeping is consistent with the possibility that Su Hung was unconscious and, therefore, had already been strangled, that possibility tells us nothing about who strangled her.
The jury also could have reasonably inferred that the knife found in a puddle of water in the kitchen sink was the weapon used to slash Su Hung’s throat and to inflict the wounds on her shoulder and torso. The water in the sink suggested that the sink had been recently used, from which a juror could *1262 infer that the knife had been washed. Defendants Hajek and Vo had no reason to wash the knife unless it was bloody from having been used in wounding someone. But even if the knife in the sink was the weapon used against Su Hung, the jury was not presented with evidence from which it could reasonably determine whether Hajek or Vo was the one who put it there. As mentioned on page 1259, ante, Vo did use a knife from the kitchen to threaten Cary, but he returned that knife to the kitchen, and because he did not wound Cary when he threatened her, he did not need to wash it. Thus, the knife in the sink may not have been the knife that Vo used to threaten Cary. Moreover, once Vo had placed back in the kitchen the knife he used to threaten Cary, there was no reason to assume (as the majority does (maj. opn., ante, at pp. 1190-1191)) that Vo, rather than Hajek, wielded the knife against Su Hung. At best, one could conclude that Vo knew where in the kitchen to find a knife and that he was inclined to use it as a weapon. But certainly Hajek, too, could have retrieved a knife from the kitchen if that was what he wanted to do. In addition, the fact that Vo was inclined to use a knife as a weapon does not imply that Hajek was not inclined to do so. In short, the fact that Vo wielded a knife against Cary cannot support a reasonable inference that it was Vo who wielded a knife against Su Hung.
The majority relies on the fact that a second pair of gloves (not the gloves defendant Hajek was wearing) was found on the table in the kitchen. The majority reasons that defendant Vo might have gone into the kitchen, removed his gloves, obtained a knife, used it to kill Su Hung, and then washed his hands and the knife. (Maj. opn., ante, at p. 1191.) Vo might indeed have done all that, but the evidence of a pair of gloves lying on the kitchen table does not tend to establish that Vo did all that. Nor can we infer much from Vo being the one who tied Su Hung’s hands behind her back and took her upstairs. Although that evidence indicates that Vo aided and abetted Su Hung’s murder, no reasonable juror could infer from that evidence that Vo personally inflicted Su Hung’s wounds and therefore was guilty of torturing her.
The strongest evidence of who inflicted the wounds on Su Hung (and thus tortured her) was the blood on defendant Hajek’s glove that matched Su Hung’s blood. As noted earlier, the doctor who performed the autopsy concluded that Su Hung was alive when her jugular vein was severed. He based that conclusion on the large amount of blood that had poured from her neck, as shown in the crime scene photos. In my view, it would be very hard. to partially sever the jugular vein of a living person, thus releasing a large amount of blood, and not get any of that blood on one’s hand or glove. Defendant Vo had no blood on his hands or on his clothing. That Hajek’s glove was stained by Su Hung’s blood is a reasonably strong indication that Hajek, not Vo, was the one who slashed Su Hung’s throat. Of course, there could be other interpretations of the evidence, but the evidence presented at *1263 trial was sufficient to allow the jury to infer that it was Hajek who wielded the knife against Su Hung and that, based on her wounds, Hajek had the requisite torturous intent. It is possible, of course, that defendant Vo first strangled Su Hung, after which Hajek wielded the knife (perhaps in a separate incident). But lacking is evidence from which that sequence of events can reasonably be inferred. As this court has observed, a jury’s finding of guilt cannot be based on a mere possibility. (People v. Reyes (1974) 12 Cal.3d 486, 500 [116 Cal.Rptr. 217, 526 P.2d 225] (Reyes); People v. Kunkin (1973) 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392] (Kunkin); People v. Redmond (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321] (Redmond); Estate of Stanford (1957) 49 Cal.2d 120, 164 [315 P.2d 681]; see People v. Ramon (2009) 175 Cal.App.4th 843, 851 [96 Cal.Rptr.3d 459] (Ramon); Kidron v. Movie Acquisition Corp. (1995) 40 Cal.App.4th 1571, 1581 [47 Cal.Rptr.2d 752].)
The majority here nevertheless concludes that “there was substantial evidence showing that Vo shared Hajek’s torturous intent” (maj. opn., ante, at p. 1191) and that “the totality of the circumstances of the crime amply demonstrated an intent to torture ... as to both defendants” (ibid.). As to Vo, the majority’s reasoning makes four points, which I discuss below.
First, the majority observes that the prosecution’s case included “substantial evidence that Vo had his own independent motive to seek revenge on Ellen,” because he had romantic feelings for Ellen’s friend, with whom Ellen had quarreled. (Maj. opn., ante, at p. 1190.) But such a motive hardly supports an inference that Vo intended to inflict extreme pain on murder victim Su Hung, who was Ellen’s grandmother. Thus, the evidence the majority cites does not establish torturous intent on Vo’s part.
Second, the majority notes that Vo knew about Hajek’s altercation with Ellen Wang and that Hajek made no secret of his intent to kill Ellen and her family. This leads the majority to conclude that a reasonable juror could infer that Vo knew Hajek’s murderous intent when Vo accompanied Hajek to the Wang family’s home. (Maj. opn., ante, at p. 1190.) I agree. But the fact that Vo knew of Hajek’s murderous intent does not establish that Vo intended to inflict extreme pain on Ellen’s grandmother. Again, the evidence the majority cites fails to establish torturous intent on Vo’s part.
Third, the majority asserts that Vo actively participated in carrying out Hajek’s plan to kill Ellen and her family: Among other things, Vo tied up Su Hung (Ellen’s grandmother), threatened Cary (Ellen’s mother) with a knife, and then took Cary to Ellen’s school to get Ellen. (Maj. opn., ante, at pp. 1190-1191.) Again, the majority misses the point. With respect to the jury’s torture findings, the critical issue is not whether Vo was an accomplice *1264 to Su Hung’s murder; rather, the critical issue is whether Vo intended to inflict extreme pain on Su Hung. The majority has not pointed to any evidence from which a reasonable juror could infer that Vo had the latter intent. Even if Vo’s active participation in carrying out Hajek’s murderous plan could give rise to a suspicion that Vo personally inflicted Su Hung’s injuries, Su Hung’s blood on Hajek’s glove tends to exonerate Vo by implicating Hajek. Moreover, “evidence that ‘merely raises a strong suspicion of the defendant’s guilt is not sufficient to support a conviction[;] [suspicion is not evidence ....’” (People v. Watkins (2012) 55 Cal.4th 999, 1024 [150 Cal.Rptr.3d 299, 290 P.3d 364], quoting Redmond, supra, 71 Cal.2d at p. 755.)
Finally, the majority notes that “the evidence is consistent with a conclusion that Vo actively participated in the torture of Su Hung.” (Maj. opn., ante, at p. 1191, italics added.) The majority reasons that, because nothing “foreclosefd] a conclusion that Vo tortured ... the victim” (ibid.), the jury could reasonably find that he did so (even though the evidence of blood on Hajek’s glove tended to implicate Hajek rather than Vo, who had no blood on his clothing or on himself). In essence, the majority concludes that Vo can be found guilty of torture because he presented no evidence clearly exonerating himself of torture. It is true that this court must defer to a jury’s verdict when reviewing that verdict for sufficiency of the evidence. But that deference does not mean allowing a jury to infer facts from a mere possibility. As has been observed, “a mere possibility is nothing more than speculation^ and] [speculation is not substantial evidence.” (Ramon, supra, 175 Cal.App.4th at p. 851; see Reyes, supra, 12 Cal.3d at p. 500; Kunkin, supra, 9 Cal.3d at p. 250; Redmond, supra, 71 Cal.2d at p. 755.)
IV.
My conclusions are these:
With respect to defendant Hajek, I agree with the majority that the evidence sufficiently supports the jury’s finding that he intended murder victim Su Hung to experience extreme pain or suffering, because there is substantial evidence that Hajek inflicted wounds that caused such pain and suffering. Therefore, like the majority, I would affirm the judgment of death as to defendant Hajek.
But with respect to defendant Vo, the evidence is, in my view, insufficient to support the jury’s finding that he shared Hajek’s intent to cause extreme pain and suffering. Therefore, unlike the majority, I would reverse, as to Vo, the torture-murder special-circumstance finding, and hence the judgment of *1265 death. Like the majority, however, I would uphold Vo’s first degree murder conviction on the theory of deliberate and premeditated murder. (See maj. opn., ante, at p. 1192.)
The petition of appellant Loi Tan Vo for a rehearing was denied July 23, 2014, and the opinion was modified to read as printed above.

Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.