Filed 7/21/15  P. v. Young CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>TIMOTHY JAMES YOUNG,<br><br>  Defendant and Appellant. | F067277<br><br>(Super. Ct. Nos. 10CM0323 & 12CM1862)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Thomas De Santos, Judge.

Sylvia Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Marcia A. Fay, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In case No. 10CM0323, Timothy James Young (defendant) pled no contest to two counts of assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(1)), in return for which two other counts and enhancement allegations were dismissed. Imposition of sentence was suspended, and he was placed on probation for five years on various terms and conditions. On January 18, 2012, he was alleged to be in violation of probation.

In case No. 12CM1862, a jury convicted defendant of carrying a loaded firearm in public (§ 25850, subd. (a); count 1), receiving stolen property (§ 496, subd. (a); count 2), possessing ammunition when prohibited from owning or possessing a firearm (§ 30305, subd. (a)(1); count 3), possessing a firearm after having been convicted of a felony (§ 29800, subd. (a)(1); count 4), possessing cocaine base (Health & Saf. Code, § 11350, subd. (a); count 5), and resisting arrest (§ 148, subd. (a)(1); count 7). As to counts 3 and 5, the jury found defendant was personally armed with a firearm in the commission of the offense (§ 12022, subd. (c)), and, as to counts 1 through 5, that he committed the offense for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)(A)).[2]

Defendant subsequently was found to be in violation of the terms of his probation in case No. 10CM0323. He was sentenced in both cases to an aggregate term of 12 years in prison, and was ordered to pay various fees, fines, and assessments.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] In count 5, the jury found defendant not guilty of possessing cocaine for sale. (Health & Saf. Code, § 11351.) Count 6, which charged defendant with actively participating in a criminal street gang (§ 186.22, subd. (a)), was dismissed upon the prosecutor's motion. As to counts 1 through 5, the first amended information alleged defendant was personally armed with a firearm in commission of the offenses. (§ 12022, subd. (c).) Although this allegation was only presented to jurors with respect to counts 3 and 5, it was subsequently determined subdivision (c) of section 12022 did not apply to any of the offenses of which defendant was convicted, and the allegations and findings were deemed changed to subdivision (a) of section 12022.

On appeal, we hold:  (1) The convictions on counts 1, 3, and 4 are supported by substantial evidence; (2) The conviction on count 2 must be reversed for insufficient evidence; and (3) If, upon resentencing, count 1 is again designated the principal term, sentence on count 3 must be stayed pursuant to section 654.

## FACTS[3]

## I

### PROSECUTION EVIDENCE

On the night of May 28, 2012, Lemoore Police Officers Santos, Moritz, and Avelar, along with Sergeant Gonzalvez, went to the Montgomery Crossing apartment complex on Tammy Lane in Lemoore, for the purpose of arresting defendant on a warrant.  They approached in such a way as to try to avoid detection by anyone in the complex.  Avelar positioned himself at the southeast corner of the complex, Moritz took up a position at the southwest corner, and Gonzalvez and Santos entered the complex at the northwest corner.  They then separated, with Santos heading east along the north side of the complex, and Gonzalvez angling south toward the complex's center.

There was a stairwell just east of the playground inside the complex.  As Santos walked toward the stairs, he saw a female who appeared to be speaking to someone at the top of the landing.  As Santos approached, he looked up and saw defendant standing on top of the landing.  Defendant was wearing a red shirt and red Chicago Bulls cap.  Santos did not see anyone else in the area.

Defendant made eye contact with Santos, who was in uniform, then turned and started to walk away.  Santos yelled at him to stop, whereupon defendant began to run south.  He ran down stairs that opened onto Tammy Lane, just east of where a white Chevrolet pickup truck was parked.

---

**3**     Because defendant raises no issues concerning case No. 10CM0323, we recite only the facts of case No. 12CM1862.

3.

When defendant exited the stairwell, he began to run in a southwesterly direction toward the truck and directly at Moritz, with Santos in pursuit. As defendant ran, he was reaching toward his front waistband. He appeared to reach inside his pants or grab the front area of the jeans, which were baggy and looked like they were sagging. Santos did not see defendant pull anything from his waistband or clothing, and was unable to tell if there was anything in defendant's hands, because they were in front of defendant's body as he ran.

Moritz, who was in uniform, yelled at defendant to stop. Defendant appeared to look at him. He began to stumble, stepped off the curb on Tammy Lane, and collided with the front passenger-side door of the white pickup. He kind of bounced off the vehicle, stumbled forward out into the street, fell down, rolled over once, and stopped. He was taken into custody almost in the middle of Tammy Lane, directly in front of, and approximately 10 to 15 feet from, the pickup. Defendant was calm and laughing. He commented that he was drunk. He did not appear to be under the influence of a stimulant.

Defendant was placed in the back of Moritz's patrol vehicle. The officers were standing in the street when Moritz, who was about 20 to 25 feet in front of the front passenger side of the truck, looked over at the vehicle and saw an object underneath it. On the side of the pickup was a thin layer of dust that was disturbed in the area of the collision. Right underneath the door, by the front passenger-side wheel, was a black nine-millimeter Beretta semiautomatic handgun with the serial number still on it. From the front of the truck, the gun was visible from the street. It did not have any dust, dirt, or debris on it. The weapon's safety mechanism was off and one round was in the chamber. There were 14 rounds of different brands and kinds of ammunition (hollow point and full metal jacket ball point bullets) in the 15-round-capacity magazine, which fit completely

4.

into the gun.[4] It is illegal for a civilian to have a magazine that holds more than 10 rounds. This magazine had writing on it that read, "restricted-law enforcement and government use only."

At no time did Santos see anyone else near the pickup. Only two or three minutes elapsed from the time the officers arrived and took up their positions, to the time defendant collided with the side of the truck. Avelar, who was stationed at the southeast corner of the apartment complex, on Tammy Lane, first saw defendant when the other officers were already standing around him. At no time did Avelar see any other individuals on Tammy Lane.

A search of defendant's person revealed no ammunition. An unlabeled prescription bottle holding 5.79 grams of a white powdery substance containing cocaine was found in defendant's right front pants pocket, however. When Santos asked defendant what it was, defendant said he had no idea. Santos also found $653 in various denominations inside the same pocket. In addition, defendant had two cellphones in his left front pocket. The screen saver on one was a picture of Isaac Donez, a validated gang member who was fairly high up in the Norteño hierarchy and who admitted backing Brown Pride Norteños. Text conversations extracted from one of the phones, together with the amount of cocaine and cash on defendant's person, led Kings County Sheriff's

---

**4**     In the course of rendering the weapon safe and booking it into evidence, Santos and Gonzalvez both handled the gun. Santos was wearing gloves. Gonzalvez was not; his priority was to render the weapon safe.

The gun subsequently was processed for fingerprints. Only one useable print was found; it was a partial print on top of the slide. Some slight fragmentary prints of no value were also found. Although a full identification could not be established, Gonzalvez could not be excluded as the source of the partial print. Defendant was excluded as the source of the print. No fingerprints were found on the magazine, and no usable prints were found on the bullets. According to the People's fingerprint expert, it is typical not to find prints on guns and bullets.

Deputy Dobbins, a member of the Kings County Narcotic Task Force, to opine the cocaine was possessed for sale.[5]

Brian Vannoort once owned the gun found in this case. Vannoort, who was a California Highway Patrol officer at the time of trial, bought the gun from a gun shop in Hanford in January 1996. He was a civilian at the time and had just been discharged from the military. He purchased the gun in order to have a personal firearm. In January 1999, Vannoort returned to his home in Hanford from his job as an air traffic controller in the Bay Area, to discover his house had been burglarized and the gun taken.

At the time Vannoort purchased the gun, it came with a 10-round magazine. He bought a 15-round magazine at the same time. At the time, such a high-capacity magazine was not restricted. Vannoort was unable to recall the exact writing on the 15-round magazine he purchased.

Officer Henderson of the Lemoore Police Department testified as an expert in gangs, specifically Norteños. Henderson was familiar with defendant from personal contacts and the reports of other Lemoore officers.[6] He explained defendant was a member of the Brown Pride Norteños, a Norteño subset. Defendant's moniker was "Criminal." In some of the text messages found on one of the cellphones in this case, there were references to "Beazt," which was something Norteños call each other. In addition, a number of gang-related items were found in a search of defendant's residence. Those items included clothing that was red, or red, white, and black, all colors claimed by Norteños.

---

**5** Dobbins explained cocaine commonly is sold in amounts of .1 and .2 grams, with .1 gram costing $10 and .2 grams costing $20. The value of the cocaine possessed by defendant was less than $200 if sold without it being broken up. In Dobbins's experience, it was common to find drug dealers in possession of more than one cellphone, one of which was usually used for their narcotics transactions, and the other which was for more personal use.

**6** The parties stipulated defendant was previously convicted of two felonies.

In Henderson's experience as a member of the Kings County Gang Task Force, he had never seen a gun lying around in the street. He had found several guns after subjects ran from him; the subjects threw them in bushes and under cars.

Every gang member with whom Henderson spoke brought up respect. The more respect someone has as a gang member, the more status that person has. The more status that person has, the higher up he moves in the gang. Committing crimes for the gang brings respect, as does "kick[ing] back" money from drug sales or other crimes to the gang. In addition, a gang member gets respect by carrying a loaded semiautomatic weapon, because it shows the person is willing to use the weapon. A gang member is always supposed to be armed. Once a gang member uses a weapon, however, it will be discarded, for example by throwing it in an aqueduct. In addition, normally the serial number will be filed off so the source of the gun cannot be determined, or it will be a stolen gun.

In response to a hypothetical question based on the prosecution's evidence in this case, Henderson opined the various crimes were committed for the benefit of, at the direction of, or in furtherance of the gang. In addition, given the circumstances surrounding defendant's past contacts with police and the fact defendant was housed in jail in a pod containing only Norteños and he had not been assaulted, Henderson concluded defendant was a Norteño "in very good standing."

## II

### DEFENSE EVIDENCE

Connie Donez, defendant's grandmother, frequently gave him money.[7] A couple of days before he was arrested in this case, she gave him a little over $800.

Mariah Davila, defendant's cousin, saw defendant every day during May 2012. During that time, defendant was using cocaine on a regular basis, including most of the

---

[7] Ms. Donez was once related to Isaac Donez by marriage.

7.

week of his arrest. When Davila picked defendant up from an aunt's house several hours before he was arrested, he was under the influence of cocaine and had been drinking.

## DISCUSSION

## I

### SUFFICIENCY OF THE EVIDENCE

Defendant contends the evidence was insufficient to sustain his convictions on counts 1 through 4. The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

With these principles in mind, we turn to defendant's specific claims.

## A. Possessing/Carrying a Firearm and Ammunition

Defendant first contends the evidence was insufficient to show he carried a loaded firearm, as required for conviction on count 1; possessed ammunition, as required for conviction on count 3; and possessed a firearm, as required for conviction on count 4.[8] We disagree.

"A defendant possesses a weapon [or ammunition] when it is under his dominion and control. [Citation.] A defendant has actual possession when the weapon [or ammunition] is in his immediate possession or control." (*People v. Peña* (1999) 74 Cal.App.4th 1078, 1083.)[9] Knowledge is also an element. (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922; see *People v. Morales* (2001) 25 Cal.4th 34, 41.) Although "[n]o specific criminal intent is required, and a general intent to commit the proscribed act is sufficient to sustain a conviction" (*People v. Snyder* (1982) 32 Cal.3d 590, 592),

---

[8] Section 25850, subdivision (a), as charged in count 1, was formerly section 12031, subdivision (a)(1). Section 30305, subdivision (a)(1), as charged in count 3, was formerly section 12316, subdivision (b)(1). Section 29800, subdivision (a)(1), as charged in count 4, was formerly section 12021, subdivision (a). Since the statutes were continued without substantive change (Cal. Law Revision Com. com., 51D pt. 3 West's Ann. Pen. Code (2012 ed.) foll. § 25850, subd. (a), p. 257; Cal. Law Revision Com. com., 51D pt. 4 West's Ann. Pen. Code, *supra*, foll. § 29800, subd. (a)(1), p. 194 & § 30305, subd. (a)(1), p. 284), authorities analyzing the former statutes are equally applicable to the present laws.

[9] Possession can also be constructive. A defendant "has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others. [Citations.]" (*People v. Peña*, *supra*, 74 Cal.App.4th at pp. 1083-1084.)

We are concerned here with whether defendant actually physically possessed the gun and ammunition, and personally carried the loaded firearm. (See *People v. White* (2014) 223 Cal.App.4th 512, 524; *People v. Overturf* (1976) 64 Cal.App.3d Supp. 1, 6.) That the items may not have been on his person at the moment of his arrest does not negate a finding he possessed and carried them. (See *People v. Palaschak* (1995) 9 Cal.4th 1236, 1237, 1240-1242.) Either the evidence was sufficient to show actual physical possession and carrying, or it was insufficient. Our analysis and conclusion would be the same under a theory of constructive possession, however.

wrongful intent must be shown (*People v. Jeffers*, *supra*, 41 Cal.App.4th at p. 922). "[A] felon who acquires possession of a firearm through misfortune or accident, but who has no intent to exercise control or to have custody, commits the prohibited act without the required wrongful intent." (*Ibid.*)

Each of the necessary elements may be established by circumstantial evidence and any reasonable inferences that can be drawn from such evidence. (See *People v. Morales*, *supra*, 25 Cal.4th at p. 41; *People v. Williams* (1971) 5 Cal.3d 211, 215.) Here, the evidence was such that a rational trier of fact could have concluded defendant had the gun in the waistband or front of his baggy pants, and that it came out when he collided with the pickup truck and fell. Although defendant's mere presence in the vicinity of the gun would be insufficient to establish possession or carrying (*People v. Elder* (2014) 227 Cal.App.4th 1308, 1313; see *In re Anthony J.* (2004) 117 Cal.App.4th 718, 728), the evidence here showed defendant — who was a gang member and so was supposed to always be armed — was reaching inside or grabbing the front of his jeans as he fled. In addition, the gun was found right below where he collided with the truck; it had no dirt, dust, or debris on it, despite the fact the truck was dusty; and the gang expert had never seen a gun just lying around in the street. No one else was seen in the area. Although a jury may not rely on unreasonable inferences, and an inference is not reasonable if it is based only on speculation (*People v. Hughes* (2002) 27 Cal.4th 287, 365), reasonable inferences lead to the conclusion defendant had the loaded gun on his person immediately prior to his arrest.

Defendant points to the lack of forensic evidence, such as fingerprints on the gun. Given testimony this was typical, however, the absence of such evidence does not negate the sufficiency of the evidence to prove possession and carrying. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293.)

Nor does *People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*), on which defendant relies, compel a different conclusion. In that case, police found convicted

10.

felons Sifuentes and Lopez in a motel room. Sifuentes was lying on top of the bed nearest the door, while Lopez was kneeling on the floor on the far side of the second bed. A loaded handgun was found under the mattress next to where Lopez knelt. (*Id*. at pp. 1413-1414.) At trial, a gang expert testified Sifuentes and Lopez were active participants in a particular criminal street gang; guns played a prominent role in the gang subculture and a "gang gun" was a gun passed freely among gang members for use in their criminal endeavors; aside from certain restrictions, a "gang gun" was accessible to all gang members at most times; and a gang member possessing a gun would inform other gang members that he had a firearm. (*Id*. at pp. 1414-1416.)

Sifuentes was convicted, inter alia, of possession of a firearm by a felon, based on the doctrine of constructive possession. (*Sifuentes*, *supra*, 195 Cal.App.4th at pp. 1413, 1417.) On appeal, he claimed the evidence was insufficient to support a finding he had the right to control the firearm discovered near Lopez. (*Id*. at p. 1413.) The Court of Appeal agreed, concluding: "The prosecutor failed to elicit from the expert any substantial evidence Sifuentes had the right to control the firearm. The expert did not testify all gang members had the right to control communal gang guns, assuming this firearm fell into that category. Rather, … he testified certain restrictions applied concerning 'access' to a gang gun and did not explain these restrictions or whether he equated access with a right to control. Nor did the expert link Sifuentes to the particular firearm found next to Lopez." (*Id*. at p. 1419, fn. omitted.)

The evidence in the present case is markedly different from that in *Sifuentes*. Even if we were to assume the doctrine of constructive possession came into play, we would find the evidence adequately linked defendant to the firearm, and established the requisite knowledge, wrongful intent, and dominion and control over it and the ammunition it contained.

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's

11.

verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Reversal of the convictions on counts 1, 3, and 4 is unwarranted.

**B.      Receiving Stolen Property**

We agree with defendant, however, that the evidence is insufficient to sustain his conviction on count 2 (receiving stolen property), because it failed to show he knew the firearm was stolen.[10]

To obtain a conviction for receiving stolen property, "the People must prove (1) the property was stolen; (2) the defendant knew it was stolen; and (3) the defendant had possession of it. [Citations.]" (*In re Anthony J.*, *supra*, 117 Cal.App.4th at p. 728.) "As to the [second] element, 'Although guilty knowledge of the fact that the property was stolen is an essential fact to be proved in a prosecution for receiving stolen property, such knowledge need not be that actual and positive knowledge which is acquired from personal observation of the fact. [Citation.] It is not necessary that the defendant be told directly that the property was stolen. [Citation.] Knowledge may be circumstantial and deductive. [Citations.]' [Citations.]" (*People v. Schroeder* (1968) 264 Cal.App.2d 217, 225.) The defendant must actually know the property was stolen, however. That he or she reasonably should have known is not enough. (See *People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302.) Furthermore, while guilty knowledge may be proven by circumstantial evidence, "when challenged on appeal those circumstances must be shown to constitute substantial evidence." (*People v. Kunkin* (1973) 9 Cal.3d 245, 254.) "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient

---

**10**      In light of our conclusion, we do not address defendant's claim the trial court erred by denying his motion for acquittal (§ 1118.1) on count 2. Moreover, since the jury was only instructed concerning property that was stolen, we need not concern ourselves with the fact the first amended information charged, and the jury found, the property was "stolen *and* obtained by extortion." (Italics added.) That there manifestly was no evidence the gun was obtained by extortion would not require reversal were the evidence otherwise sufficient. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

In the present case, the evidence undisputedly established the gun was stolen. Unexplained possession of stolen property, standing alone, will not support a conviction for receiving stolen property, however. (*People v. Jackson* (1970) 14 Cal.App.3d 57, 63.) On the other hand, "[p]ossession of *recently* stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt. [Citations.]" (*People v. McFarland* (1962) 58 Cal.2d 748, 754, italics added.) Thus, "'[p]ossession of stolen property, accompanied by an unsatisfactory explanation of the possession or by suspicious circumstances, will justify an inference that the property was received with knowledge it had been stolen. [Citations.]' [Citation.]" (*People v. Schroeder*, *supra*, 264 Cal.App.2d at p. 225; accord, *People v. McFarland*, *supra*, 58 Cal.2d at pp. 754-755.)

"An inference of guilt, otherwise reasonable, may be weakened beyond the point of reasonableness if it appears that the period between theft and discovered possession was inordinately long under the circumstances." (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1150, fn. 6.) In the present case, the gun clearly was not recently stolen, "what[ever] time intervals may be embraced within the term 'recent.'" (*People v. Anderson* (1989) 210 Cal.App.3d 414, 421.) Insofar as the record shows, defendant was not asked for an explanation of how he acquired the weapon. (Cf. *People v. Lopez* (1954) 126 Cal.App.2d 274, 277-278 [although nine months elapsed between time item was stolen and time it was found in defendant's possession, evidence was sufficient to show guilty knowledge where there was testimony defendant would buy or receive stolen property when opportunity arose, and defendant gave conflicting and unsatisfactory accounts of his acquisition of item].) Nor can the requisite knowledge be inferred from

13.

defendant's flight from police, even assuming he intentionally discarded the weapon rather than unintentionally dropping it; defendant no doubt did not want officers to find the significant amount of cocaine he had on his person or the firearm it was illegal for him to possess because he was a convicted felon. (Cf. *People v. Taylor* (1969) 2 Cal.App.3d 979, 983-984 [knowledge gun was stolen reasonably inferable from defendant's flight, discard of weapon upon seeing police officer, wearing of outer clothing that could easily be removed so defendant could change appearance, and defendant's possession of other, separately stolen, property].)

In his argument to the jury, the prosecutor addressed the knowledge element, stating:

> "Okay, how do we prove that? Well, the People submit to you that here you have a Norteno gang member. You heard plenty of evidence that having a stolen weapon is beneficial to the gang, because it can't be traced. And that in addition to that, this particular weapon had an illegal 15-round high capacity magazine that was clearly stamped, and you will see the exhibit, something to the effect restricted use, law enforcement only, okay. So … the People submit to you that is how the defendant knew that it was stolen. He has got this illegal weapon, he doesn't have any — there is no evidence that there was any indicia of ownership on his part, but the People submit to you just based on the fact that he is a Norteno gang member, that he is in possession of this weapon … that has a 15-round high capacity magazine that is clearly stamped law enforcement only. The People submit to you that he knew that this weapon was stolen at some point, and he had a stolen weapon."

Henderson, the gang expert, testified that "[n]ormally" a weapon used by gang members has the serial number filed off or is a stolen gun. He did *not* testify, however, that gang members *only* use stolen guns, that every gun used by a member of defendant's gang would be stolen, or that every gang member would have knowledge of the likely origin of any gun he used. (See *People v. Sifuentes*, *supra*, 195 Cal.App.4th at p. 1417.) On the evidence before us, such generalizations would be speculative, particularly in light

14.

of Henderson's testimony there were approximately 2,500 Norteños in Kings County alone.

As for the high-capacity magazine that bore the "restricted" legend, it appears Vannoort purchased it legally at a time he was neither in the military nor a member of law enforcement.[11] Even assuming defendant was aware of the stated restriction (of which we cannot be certain, because the magazine fit completely into the gun and, given the absence of fingerprints on the bullets, we cannot know whether defendant loaded the clip himself or the gun was given to him already loaded) and the fact it was illegal for a civilian to possess a magazine of that capacity, this suggests the gun was sold or transferred unlawfully, not necessarily that it was stolen. An illegal weapon is not inevitably a stolen one. (See *People v. Kunkin*, *supra*, 9 Cal.3d at pp. 254-256 [receiving stolen property convictions reversed for insufficient evidence of guilty knowledge; circumstances that might put publisher on notice official displeasure would result from publication of information released without authorization are not same as circumstances that should signal property tendered was stolen].)

We recognize we are required to consider the evidence as a whole. Taken together and viewed in the light most favorable to the prosecution, however, the evidence here establishes defendant knew his possession of the gun was unlawful, but produces nothing more than speculative inferences concerning his knowledge the gun was stolen. "'[S]peculation is not evidence, less still substantial evidence.'" (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)

The conviction on count 2 must be reversed.

---

**11** We can only speculate the fact he was an air traffic controller may have been sufficient to satisfy the restriction.

15.

## II

### IMPOSITION OF CONSECUTIVE TERM ON COUNT 3

In light of our reversal of the conviction on count 2, the matter must be remanded for resentencing. For guidance of the court and parties, however, we address defendant's claim the trial court erred by imposing a consecutive sentence on count 3.

The trial court designated count 1 (carrying a loaded firearm in public) as the principal term. It imposed, inter alia, a consecutive term on count 3 (felon in possession of ammunition), although it stayed, pursuant to section 654, sentence on count 4 (felon in possession of a firearm).

Defendant contends, and the People concede, sentence on count 3 should have been stayed pursuant to section 654, inasmuch as the same ammunition was involved in each count and there was no evidence to support the trial court's implied factual finding defendant had different or multiple objectives in carrying the loaded firearm and possessing the ammunition in the gun itself. (See, e.g., *People v. Jones* (2012) 54 Cal.4th 350, 357-358; *People v. Sok* (2010) 181 Cal.App.4th 88, 100; *People v. Lopez* (2004) 119 Cal.App.4th 132, 137-138.)

On remand, the trial court is entitled to reconsider its entire sentencing scheme, so long as defendant is not sentenced to a term exceeding his original sentence. (*People v. Burns* (1984) 158 Cal.App.3d 1178, 1184.) Should the trial court again designate sentence on count 1 as the principal term, it must stay sentence on count 3.

## **DISPOSITION**

The conviction on count 2 is reversed. Sentence is vacated and the matter is remanded for resentencing. In all other respects, the judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

POOCHIGIAN, J.