Filed 7/29/14  P. v. Vargas CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RODOLFO ANTHONY VARGAS and ANTHONY MICHAEL VARGAS,<br><br>        Defendants and Appellants. | B245910<br><br>(Los Angeles County<br>Super. Ct. No. MA056093) |

APPEALS from judgments of the Superior Court of Los Angeles County.  John Murphy, Commissioner.  Modified and affirmed with directions as to Rodolfo Anthony Vargas; reversed as to Anthony Michael Vargas.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Rodolfo Anthony Vargas.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Michael Vargas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.

Rodolfo Anthony Vargas (Rodolfo) and Anthony Michael Vargas (Anthony)[1] appeal from the judgments entered following a jury trial in which they were convicted of first degree burglary.

Anthony contends there was insufficient evidence of entry and intent to support his conviction. We agree there was insufficient evidence to support a finding Anthony personally intended to commit larceny when he entered the victims' mobile home. The prosecutor limited his case to theories that each defendant was a direct perpetrator, not an aider and abettor, and that each defendant's intent was to commit theft. Although Anthony made a slight entry through a bedroom window in his relatives' mobile home in the early hours of the morning, he did not take or attempt to take any property, he did not flee upon discovery but instead identified himself, said he was looking for his cousin who lived there, argued with his uncle, and attempted to enter another window in full view of his uncle and his uncle's wife, who was on the phone with a 911 dispatcher. In addition, Anthony's cousin told responding law enforcement officers Anthony had texted him saying he was at the mobile home and wanted to hang out with the cousin. Accordingly, we reverse Anthony's conviction.

Rodolfo contends the trial court reduced the prosecutor's burden of proof by misstating the reasonable doubt standard. The court's inclusion of an alternative definition of reasonable doubt in an introductory comment during voir dire was highly inadvisable but did not reduce the burden of proof because the court repeatedly instructed the jury with the correct standard and included the correct standard in the written instructions it provided to jurors for use during their deliberations.

Rodolfo contends the trial court erred by admitting gang evidence. We disagree. The court admitted very limited evidence that was highly relevant to the credibility of a

---

**1** We refer to the parties and witnesses by their first names because many share a surname. No disrespect is intended.

reluctant witness's testimony and immediately instructed the jury on the limited admissibility of the evidence.

Rodolfo contends the trial court erred by failing to instruct on aiding and abetting principles. We disagree. Although aiding and abetting principles were relevant to Anthony's liability, they were irrelevant with respect to Rodolfo, whose liability was premised on his own entry into the mobile home and theft of a shotgun from within it.

Rodolfo contends the on-bail enhancement was not supported by sufficient evidence. We agree. The trial court took judicial notice that bail had been "set" in another case, but no evidence, stipulation, or even judicial notice established that Rodolfo had actually been released on bail and that he remained on bail at the time of the burglary charged in this case. Moreover, the appellate record indicates bail in the other case was set *after* the date of the charged offense in this case. Accordingly, we strike the on-bail enhancement finding.

## BACKGROUND

### 1. Relationship of defendants and victim

Defendants are the nephews of Miguel Garcia Vargas (Miguel). Miguel testified he did not see defendants for 13 or 14 years after defendants' father (Miguel's brother) moved away, then died. He had seen Rodolfo several times in the months before the charged offense, and Miguel's son Cesar Garcia (Cesar) had maintained a relationship with Rodolfo, but not Anthony.

### 2. The burglary

On May 1, 2012,[2] Miguel and his wife, Lillian Ocasio (Lillian), lived with Cesar in a mobile home in Lancaster. Lillian testified a noise awakened her around 1:00 a.m. She noticed the screen had been removed from the window and the window had been opened. She saw a young man she recognized as Miguel's younger "cousin" trying to

---

[2] Undesignated date references pertain to 2012.

3

come through the window.  At trial Lillian identified Anthony as the man who tried to come through the window.  Lillian awakened Miguel.

Miguel testified that after Lillian awakened him, he noticed the curtains were "big."  Then he noticed two feet, followed by "knees through the window."  The person's hands were "holding to the window."  Miguel said, "Hell, no," and pushed the person out.  The person was then standing outside Miguel's bedroom window.  Miguel asked him who he was and he replied, "Anthony."  Anthony resembled Miguel's brother, and Miguel realized the intruder was his nephew Anthony.  Miguel testified he also knew it was Anthony "because the day before, they told me Anthony was coming to see us."

Anthony, while still holding onto the window, began saying derogatory things about Miguel and his family.  Miguel argued with him for five to ten minutes.  Anthony also said, "'I want your son.  We looking [*sic*] for your son.'"  Miguel told Anthony Cesar was not there.  While speaking with Anthony, Miguel saw Rodolfo in the street, near a silver Mazda that was parked alongside the mobile home.

While arguing with Anthony, Miguel heard a noise from Cesar's bedroom and told Lillian to investigate.  Lillian testified she heard "a commotion" in Cesar's room.  She looked in through "a crack at the door" and saw the window in Cesar's room was wide open and the screen had been removed.  She saw a dark figure lift an object about three feet long from the bed and climb out the window with it.

Miguel testified Cesar approached on foot and announced that the police were coming.  Both Anthony and Rodolfo "went after" Cesar.  Cesar ran to a neighbor's home.

Lillian phoned 911 and spoke to the dispatcher.  A recording of that call was played at trial.  She explained she told the dispatcher she did not know who the people were "to protect [herself]."  She later testified she was reluctant to testify and to identify defendants because "family members" had said defendants were "gang related."  When asked which gang, she simply testified, "Mexican."

Miguel testified Anthony went to the kitchen window while Lillian was on the phone with the 911 dispatcher.  Anthony said, "'Let me in.  Let me in," but Miguel

4

refused. Anthony then attempted to enter through the kitchen window. "[P]arts" of Anthony's body actually came through the window into the kitchen. Miguel tried to close the kitchen window.

While Lillian was still on the phone with the 911 dispatcher, Cesar entered the mobile home and announced someone had stolen his shotgun from his bedroom. Cesar then spoke to the dispatcher.

Cesar testified he was supposed to go to Rodolfo's house that night to give him "cigarettes and stuff," but he went instead to a bar and a friend's mobile home in the same park. He was drunk. When Cesar was walking back toward his own mobile home he saw his neighbor and the defendants. The defendants were "just chilling" and "playing catch" with a football. Cesar hopped a neighbor's fence to get a quart of beer, and the neighbor said he was going to phone the police. Cesar got his beer, then went home. He denied that he was scared.

Cesar denied seeing defendants in the mobile home and explained he only repeated to the dispatcher what Miguel had told him. He admitted, however, his shotgun was missing and he was angry about that. Although he claimed he had no memory of speaking to the dispatcher, he testified he told the dispatcher, "I ain't no snitch."

### 3. Law enforcement response

Los Angeles County Sheriff's Deputy Michael Spears responded to the burglary call. He testified Cesar said he had received a text message from Anthony saying Anthony was at Cesar's home and wanted to hang out. As Cesar returned home he saw Rodolfo coming out of his bedroom window, then saw Anthony and Rodolfo walking down the driveway from Cesar's mobile home. Cesar said he talked to defendants and they began to argue with him and yell at him. Cesar said he became frightened, so he ran and hid at a neighbor's home. When Cesar returned home, he noticed his shotgun was missing. Spears testified Cesar did not appear to be drunk and Spears detected no odor of alcohol emanating from Cesar.

5

Spears testified Miguel said he had seen Rodolfo in Cesar's bedroom. At trial Miguel denied this referred to the May 1 incident and testified Rodolfo had broken into Cesar's bedroom in the mobile home "a couple of times before this incident."

Miguel and Cesar gave Spears defendants' names and Miguel gave another responding deputy directions to Rodolfo's home, which was approximately 1.5 to 2 miles from Cesar's mobile home.

**4.      Defendants' arrest and search of Rodolfo's home**

Deputies went to Rodolfo's home. Defendants were standing outside with two women, but refused the deputies' command to approach. Although the deputies were aiming guns at defendants, defendants yelled at the deputies that they had not done anything and went inside the house. Spears and about seven other deputies arrived. After about 30 minutes, deputies managed to detain defendants, a third man, and four women at the house.

Rodolfo told Spears he had been to Cesar's home earlier in the day to take him a cigarette. Rodolfo denied taking Cesar's shotgun. Anthony told Spears he had not seen Cesar in five years. He denied being at Cesar's home that night and denied taking Cesar's shotgun.

Sheriff's deputies obtained a warrant and searched Rodolfo's home about 6:30 a.m. but did not find a shotgun. There were five other people in the home before the deputies searched it.

**5.      Testimony of defense witnesses**

Cheri Hanson, who was a friend of Anthony's wife Leanna, testified she was also at Rodolfo's house on the night of April 30. She did not see Anthony or Rodolfo leave the house that night.

Defendants' mother, Dolores Archer, testified she was at Rodolfo's house with Anthony, Rodolfo, and others from no later than 5:00 p.m. on April 30 until they were arrested on the morning of May 1. Neither Anthony nor Rodolfo left the house that night.

Archer further testified Miguel had never accepted her or her children and repeatedly had said Miguel's brother was not the father of her children. Miguel had made a scene at his brother's funeral, and Archer and her children had no contact with Miguel or his family thereafter.

Alma Zenteno testified she, Rodolfo, and their children lived at the house the deputies came to on the morning of May 1. She and Rodolfo were asleep and she did not see him leave the house that night.

## 6. Verdicts and sentences

A single jury convicted both defendants of first degree burglary. The jury further found a person other than an accomplice was present in the residence during the burglary and Rodolfo was on bail or on his own recognizance at the time he committed the burglary.

The court sentenced Rodolfo to the high term of six years in prison but did not impose, stay, or strike the on-bail enhancement. The court sentenced Anthony to the low term of two years in prison.

## DISCUSSION

## 1. Sufficiency of evidence for Anthony's conviction

Anthony contends his conviction is not supported by sufficient evidence of either his entry into the mobile home or his intent to commit theft. We conclude he is correct with respect to intent and thus address only that element.

## a. Requirement of sufficient evidence

Criminal judgments must be supported by evidence sufficient to persuade a reasonable jury of guilt beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) In assessing the sufficiency of evidence, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.) Substantial evidence is "'"evidence that is

7

reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*Ibid*.)

Legal theories not presented to the jury cannot be considered in assessing the sufficiency of evidence. (*People v. Kunkin* (1973) 9 Cal.3d 245, 251 (*Kunkin*).)

**b.    Elements of burglary**

Burglary involves the act of unlawful entry accompanied by the specific intent to commit grand or petit larceny or any felony. (Pen. Code, § 459; *People v. Montoya* (1994) 7 Cal.4th 1027, 1041.) A defendant may be convicted of burglary upon entry with the requisite intent, regardless of whether the felony or theft actually committed is different from that originally contemplated, or whether any felony or theft actually is committed. (*Id*. at pp. 1041–1042.) First degree burglary requires entry into an inhabited dwelling house, trailer coach, or an inhabited portion of any building. (Pen. Code, § 460, subd. (a).)

"Because intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances disclosed by the evidence." (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245.) "Whether the entry was accompanied by the requisite intent is a question of fact for the jury." (*Ibid.*)

"Evidence of theft of property following entry may create a reasonable inference that the intent to steal existed at the moment of entry." (*In re Matthew A*. (2008) 165 Cal.App.4th 537, 541.) Other factors relevant to a finding of larcenous or felonious intent include a forcible and unlawful entry (*People v. Fitch* (1946) 73 Cal.App.2d 825, 827 (*Fitch*)), entry through a window or a locked door (*People v. Jordan* (1962) 204 Cal.App.2d 782, 787 (*Jordan*)), stealthy behavior (*ibid.*), flight upon being detected (*ibid*; *People v. Frye* (1985) 166 Cal.App.3d 941, 947), possession of a weapon or burglary tool (*Frye*, at p. 947), and the movement of property, even though it is not actually taken (*Fitch*, at p. 827).

"Where the facts and circumstances of a particular case and the conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny

or any felony, the conviction may not be disturbed on appeal." (*People v. Nunley* (1985) 168 Cal.App.3d 225, 232.)

**c.     Substantial evidence did not support an inference Anthony entered the mobile home with intent to commit larceny**

As a preliminary matter, we must note that the prosecutor's sole theory of each defendant's criminal liability was as a direct perpetrator, *not* as an aider and abettor to his codefendant. Consistent with the prosecutor's theory of liability, the court did not instruct the jury upon aiding and abetting. In assessing the sufficiency of the evidence, we cannot consider whether the evidence would have supported Anthony's conviction of burglary as an aider and abettor because that theory was not presented to the jury. (*Kunkin*, *supra*, 9 Cal.3d at p. 251.)

Because the prosecutor's theory was premised on Anthony's alleged intent to commit theft, we also are required to consider only whether the record contains substantial evidence to support a finding Anthony intended to commit theft, not any felony, when he entered the home. The prosecutor could have chosen to make an alternative contention that defendants intended to assault Cesar, but his failure to put this theory before the jury precludes its consideration on appeal.

Although Anthony made an unlawful entry through Miguel's bedroom window, he did not take, attempt to take, or prepare to take any property. Nor did he flee upon detection. Indeed, Miguel testified Anthony stood outside the bedroom window, in full view and talked to Miguel. Miguel asked him who he was and he replied, "Anthony." While continuing to stand in full view of Miguel, Anthony insulted Miguel and argued with him. Anthony also explained he was looking for Cesar. Cesar effectively confirmed this when he told Deputy Spears Anthony had sent him a text message saying Anthony was at Cesar's home and wanted to hang out, so Cesar returned home. When Cesar arrived and said the police were coming, Anthony still did not flee, but chased Cesar, then went to the kitchen window.

9

In addition, there was no evidence Anthony carried a weapon or burglary tools. He was not entering a store or the home of a stranger. Indeed, he sent Cesar a text message saying he was at the mobile home and wanted to hang out. Although no evidence was introduced regarding the time the message was sent, it appears from Miguel's testimony that Anthony was busy dealing with Miguel from the time Anthony got his knees through the bedroom window until the time of Cesar's arrival. Thus, it would be reasonable to infer Anthony sent Cesar the message before Anthony attempted to enter Miguel's bedroom window. Sending the message to Cesar, effectively asking him to return home, was inconsistent with an intent to commit a theft at the mobile home.

After Cesar ran off, Anthony neither fled nor attempted a stealthy reentry. He instead went to the kitchen window while both Miguel and Lillian were in the kitchen and repeatedly asked Miguel to let him in. When Miguel refused, Anthony attempted to enter that window while Miguel watched. It would be unreasonable to infer Anthony attempted that entry intending to commit a theft in full view of Miguel and Lillian, who not only knew who he was, but also were alert and defensive. In this regard, it is also noteworthy that Anthony was apparently unarmed. At a minimum, if he was armed, he did not display the weapon to attempt to overcome resistance by Miguel and Lillian.

Although Anthony's false statements to sheriff's deputies supported an inference of consciousness of guilt, of something, we do not know what it was and his statement reveals nothing about his intent at the time of entry. Anthony may have thought he had trespassed by beginning to climb in through the mobile home windows. He may have known Rodolfo stole Cesar's shotgun and feared he would be charged for that theft along with Rodolfo. The inference is too vague to lend support to the theory Anthony intended to commit theft when he entered the mobile home, especially in light of the surrounding facts and circumstances.

The Attorney General argues, "The actions of Rodolfo, who was with Anthony throughout, exposed the reason for the break-in, to steal Cesar's shotgun." This would have been a sound argument if the prosecutor had relied upon an aiding and abetting

10

theory as to Anthony and the court had instructed the jury on aiding and abetting. Anthony's conviction here, however, must be premised upon his own acts and intent, not Rodolfo's.

The Attorney General also argues, "Burglarious intent can be reasonably inferred from an unlawful entry alone." Many reported decisions include a similar statement, but the defendant's conduct in each case proclaiming this principle went beyond mere entry to reveal, or at least support a strong inference of, an intent to commit larceny or another felony. In *People v. Hinson* (1969) 269 Cal.App.2d 573, cited by the Attorney General, property was stolen from the store defendant entered. (*Id.* at p. 576.) In *People v. Wolfe* (1967) 257 Cal.App.2d 420, also cited by the Attorney General, a rifle and credit card were stolen from the house defendant entered. (*Id.* at p. 422.) Property also was stolen from the premises entered in *Jordan*, *supra*, 204 Cal.App.2d at page 786, and *People v. Stewart* (1952) 113 Cal.App.2d 687, 691. In *Fitch*, *supra*, 73 Cal.App.2d at page 827, a can of gum had been moved from beneath a counter in the restaurant where the defendant was apprehended. In *People v. Michaels* (1961) 193 Cal.App.2d 194, the defendants were apprehended inside an optical shop at 2:40 a.m. The door to the optical shop had been pried open, defendants had plaster dust and bits of plaster on their clothing, one of the defendants was holding a screwdriver when the police arrived, and the police found a hole large enough to climb through punched through the wall of optical shop into an adjacent inn, where defendants had been drinking a few hours earlier. (*Id.* at pp. 196–197, 199.) In *People v. Martone* (1940) 38 Cal.App.2d 392, the defendant used a wrench to break a hole in the glass on a store door and was apprehended with his arm inside the hole, attempting to unlock the door. (*Id.* at p. 393.)

The record in this case presents no circumstances supporting an inference Anthony intended to steal. He did not take or even move any property. He did not break into a store or a stranger's home; he entered, albeit inappropriately, the home of his uncle and cousin after notifying the cousin he was present and wanted to hang out. The line of cases cited by the Attorney General is thus distinguishable.

11

Anthony's behavior in entering without permission was unlawful and probably would have supported a misdemeanor aggravated trespass conviction under Penal Code section 602.5, subdivision (b), but the facts and circumstances of this case, viewed in the light most favorable to the judgment, do not add up to substantial evidence reasonably indicating his purpose in entering the mobile home—either at the bedroom window or at the kitchen window—was to commit theft, the only theory presented to the jury. Accordingly, we reverse Anthony's conviction for insufficient evidence. The charge may not be retried.

We reject the Attorney General's request to reduce the conviction to attempted burglary. An attempt requires the specific intent to commit the crime attempted. (Pen. Code, § 21a.) The insufficiency of evidence as to Anthony's intent thus precludes conviction of attempted burglary, given the prosecutor's exclusive reliance upon the theory the entry was to commit a theft. Nor can we reduce the offense to a violation of Penal Code section 602.5, subdivision (b), because that offense is not a lesser included offense of burglary. (*People v. Lohbauer* (1981) 29 Cal.3d 364, 369.)

Given our disposition, we do not consider the remaining issues Anthony raises on appeal.

**2.      Statement during voir dire of alternate reasonable doubt definition**

Rodolfo contends the trial court reduced the prosecutor's burden of proof by misstating the reasonable doubt standard. The court's inclusion of an alternative definition of reasonable doubt during voir dire was highly inadvisable but did not, under the circumstances, constitute error.

**a.      The court's statements and instructions**

During voir dire of the first panel of prospective jurors, the trial court told the jurors, "There is a standard that [the prosecutor] must meet in this case if he's to be successful. And he must prove guilt by a standard known as proof beyond a reasonable doubt. And I'm going to define that standard for you right now in a couple of different

ways. [¶] So I'm going to—this is so important, I'm not allowed to ad lib it. I'm going to read the definition as I'm required to do."

The court then read the following to prospective jurors: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People, meaning the deputy district attorney, has proved the case beyond a reasonable doubt, you must impartially, impartially compare and consider all of the evidence that is to be received throughout this entire trial. And unless that evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal, and you must find them not guilty."

The court continued, "Defined a little differently: (Reading.) [¶] Reasonable doubt is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. [¶] Reasonable doubt is that state of the case which after the entire comparison and consideration of all of the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge. Abiding, meaning continuing."

After reiterating there was no requirement of absolute certainty, the court made the statement challenged on appeal: "I'm going to give you the definition that a federal appeals court has—has referred to. And this is it. [¶] (Reading.) [¶] Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant or defendants are guilty. It is not required that the government prove guilt beyond all possible doubt. [¶] So that's the standard. And I want you folks to think about that standard as we go through this process."

Four days later, after the jury was sworn, the trial court instructed in the language of CALCRIM No. 103: "A defendant in a criminal case is presumed to be innocent. And this presumption requires that the People prove a defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you that the People must prove something, I mean

13

they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that is to be received throughout this entire trial. And unless that evidence proves the defendants guilty beyond a reasonable doubt, he or they would be entitled to an acquittal, and you must find them not guilty."

Seven days after making the challenged statement, the trial court instructed the jury after the close of evidence. The charge included CALCRIM No. 220, which provides, in pertinent part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you the People must prove something, I mean that they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. [¶] Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

The trial court told the jury it would send "at least" five copies of the printed jury instructions into the jury room.

b.     **The requirement of proof beyond a reasonable doubt and instruction thereon**

Due process requires the prosecution to prove every element of a crime beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068].) The trial court has a duty to instruct sua sponte upon this requirement. (*People v. Aranda* (2012) 55 Cal.4th 342, 356; *People v. Vann* (1974) 12 Cal.3d 220, 226–228.)

14

Penal Code section 1096 defines reasonable doubt as follows: "'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.'"

CALCRIM No. 220 and CALJIC No. 2.90 properly set forth the reasonable doubt standard. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088–1089 [CALCRIM No. 220]; *People v. Godwin* (1996) 50 Cal.App.4th 1562, 1571–1572 [CALJIC No. 2.90].)

Attempts by trial courts to clarify, paraphrase, or explain the reasonable doubt standard are fraught with peril and often result in reversals of convictions. (See *People v. Garcia* (1975) 54 Cal.App.3d 61, 63–65.) As the appellate court in *People v. Johnson* (2004) 119 Cal.App.4th 976 advised at page 986: "To any trial judge who feels the urge to clarify or explain reasonable doubt, we commend the concise history of the reasonable doubt standard that appears in the latest CALJIC compendium. (California Jury Instructions, Criminal, Appendix B (Jan. 2004 ed.).) Originating in English cases of centuries ago, that history came to fruition only in the past decade with 'the universal approval' by federal and state courts alike of CALJIC No. 2.90, 'conclusively settl[ing]' its 'legal sufficiency and propriety.' [Citation.] We trust that any trial judge who reads that history will heed the two English bards whose sage advice antedated *Garcia* by only a few years: 'Let it be.' (Lennon & McCartney (Northern Songs 1970) 'Let It Be.)"

**c.     The trial court's inadvisable comment did not reduce the prosecution's burden of proof**

The trial court's attempt during voir dire to elaborate upon or explain the reasonable doubt standard by reference to a formulation it found in a federal appellate case was highly inadvisable. Nevertheless, we do not agree with Rodolfo that the remark reduced the prosecution's burden of proof. The remark was brief and made during the initial stages of voir dire. Prior to making the remark, the court read the correct standard in the language of CALCRIM No. 220 and CALJIC No. 2.90. After the jury was sworn,

15

the court read it CALCRIM No. 103, which sets forth the correct standard in the same language as CALCRIM No. 220. After the close of evidence, the court instructed the jury with CALCRIM No. 220 and, apparently, sent copies of this instruction, along with all other instructions given, into the jury room for use during deliberations. The remark was made on November 2, 2012, and the jury did not begin deliberating until November 13, 2012. Under all the circumstances, we conclude there is no possibility the deliberating jurors understood the court's brief remark—if they even remembered it—to be the correct definition or an alternative definition of the reasonable doubt standard. (See *People v. Avila* (2009) 46 Cal.4th 680, 715–716 [potentially misleading remark by trial court during voir dire not judicial misconduct because remark was not intended to be and was not a substitute for full instructions at end of trial].)

### 3. Admission of gang evidence

Rodolfo contends the trial court abused its discretion and violated his due process right by allowing Lillian to testify she was fearful because she had heard from family members defendants were "related" to a "Mexican gang."

### a. Relevant proceedings at trial

### (1) Pretrial motion

Before trial, defendants moved to exclude gang evidence. The prosecutor said he did not intend to introduce gang evidence.

### (2) Lillian's evasive testimony

Lillian initially testified the person she saw trying to come through her bedroom window was Miguel's "younger cousin." The prosecutor asked her the name of the "younger cousin." Lillian apparently hesitated, and the court stated, "We have to have these questions answered, so please answer them." Lillian responded, "Yeah. I really—I really—I can't say the name. I'm kind of having problems with that." The prosecutor asked what she meant. Lillian said she was "kind of nervous." The prosecutor asked her if "that person" was present in the courtroom. Lillian replied, "Uh—uh, yes." The prosecutor asked Lillian where "that person" was seated and what he was wearing.

16

Lillian asked if she was supposed "to point to it." The prosecutor said, "Yes." Lillian said, "Oh, God." The court urged her to "Go ahead, please. Point to who it is." After the prosecutor again asked her to state "where he is seated" and what he was wearing, Lillian said he was wearing a white shirt.[3] When the prosecutor attempted to clarify her identification, she said, "[Y]ou know, no, actually, he's not in the courtroom. He's the younger—the younger one. Not the oldest one." The prosecutor asked Lillian twice more if the person who came through the bedroom window was in the courtroom, and Lillian insisted he was not present.

A little later, the prosecutor remarked that Lillian seemed reluctant to answer his questions and was "looking down right now." He asked if she was scared. Defense counsel objected, but Lillian said she was. On further questioning, Lillian stated she was nervous and scared. She explained that the break-in was frightening. The prosecutor agreed, but asked Lillian whether she was scared as she was testifying. She replied, "Of course, I am," then explained, "I'm afraid for my life."

On cross-examination, counsel for Rodolfo asked Lillian whether, during the 911 call, she said she "didn't know who these people were." Lillian responded, "Well, I said that to—to protect myself." On redirect examination, Lillian explained she did not identify the intruder to the police "because I had some, you know, fears of saying something." Asked to elaborate, Lillian said, "Fear for my life, you know."

**(3) Cesar's evasive testimony**

In his trial testimony, Cesar essentially repudiated his statement to the sheriff's deputy who interviewed him shortly after the incident. He claimed he was drunk, saw his cousins playing football but nothing else, and jumped a fence to get a can of beer. He claimed everything he previously said to the 911 dispatcher or deputies was based on what Miguel had told him, not his personal knowledge. The prosecutor played the

---

[3] Based on Miguel's testimony earlier on the same day, it appears Rodolfo was wearing a white shirt and Anthony was wearing a "light" or "silver" shirt. Later the same day, Cesar described Anthony's shirt as "gray."

17

recording of the 911 call and asked Cesar if he remembered a statement about talking to someone when they arrived. Cesar replied, "No. [¶] I remember I said, I ain't no snitch."

**(4)    Mid-trial motion to admit gang evidence and trial court's ruling**

The day after Lillian and Cesar testified, the prosecutor asked the court to allow him to ask Lillian and Cesar about the basis for their fear and reluctance to testify, which the prosecutor believed was related to Rodolfo's membership in a gang. The prosecutor explained Rodolfo had a tattoo that appeared to refer to a gang and in another case was alleged to have made a gang-related threat. Defense counsel objected that the purported gang fear was without foundation, introducing gang evidence would be highly prejudicial, and the defense had not received discovery on the issue.

The court decided Cesar and Lillian should be examined outside the presence of the jury before the court ruled on the prosecutor's motion.

Upon such examination, Cesar denied he was uncomfortable or concerned about testifying. He admitted, however, that he had asked to enter the courthouse through a back entrance because he did not want anyone to see him. He would not explain why he did not want to be seen. He claimed he was not aware that either defendant was a member of any gang or engaged in gang activity.

Lillian testified, outside the presence of the jury, her fear of testifying stemmed from knowledge she had about defendants. Asked to explain, she testified she knew "that they—they could be very dangerous," meaning "that they would, actually, shut people up" "for good" "to stop them from testifying." Upon further questioning, she clarified that by "they" she meant defendants. She further testified she was afraid to testify because "they are violent people" and hung around with "[g]ang-related people."

On cross-examination, Lillian explained her belief defendants were in a gang stemmed from what "family members" had told her. She could not identify the gang more specifically than a "Mexican gang."

18

The court then ruled that expert testimony would be admitted to explain Lillian's inconsistency and behavior as a witness. Defense counsel then moved for a mistrial or, in the alternative, a continuance to obtain their own expert witness and obtain discovery on the issue. The court suggested, as an alternative, it would limit the evidence to Lillian testifying that she was fearful because "she heard that one or both [defendants] are members of a gang." Defense counsel requested the court give a limiting instruction stating the evidence was admitted solely with respect to Lillian's state of mind and was not to be considered "as a sign of guilt." The court agreed.

**(5) Lillian's further testimony**

Lillian was recalled as a witness in the presence of the jury and testified she was fearful while testifying because family members had said defendants were "gang related." Defense counsel again asked her which gang, and she replied, "Mexican gang." On redirect examination, Lillian identified Anthony as the person she saw "at the window."

**(6) Court's limiting instruction**

Immediately after Lillian finished testifying, the court said to the jury, "[T]he testimony you just heard from Miss [Lillian] Ocasio is not offered to prove anything at all against the defendants in this case. It was not—that testimony was not offered for the truth of what she said. It was offered solely to indicate to you what her state of mind is, specifically, in relation to her statement that she was in fear. [¶] And I'm going to explain that again at the end of the case in a little more detail so that you fully understand that." The court continued, "The testimony you heard from Miss [Lillian] Ocasio constitutes hearsay. In other words, her testimony was she had heard from some third person something about these two men. That's just hearsay. Hearsay is inherently unreliable. That's why it was not offered for the truth of what she said, simply offered to explain her fear."

At the close of evidence, the court reiterated its limiting instruction: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. This instruction refers to the testimony

19

of Ms. [Lillian] Ocasio who testified that she feared giving testimony. The reason for her fear may not be considered by you in arriving at a verdict."

### b.     Pertinent legal principles

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of an action." (Evid. Code, § 210.) But relevant evidence should be excluded if the trial court, in its discretion, determines its probative value is substantially outweighed by the probability its admission will either be unduly time consuming or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. (Evid. Code, § 352.)

Evidence a witness is afraid to testify or fears retaliation is relevant to the credibility of that witness and is therefore admissible. (Evid. Code, § 780, subd. (j); *People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1587–1588.) Jurors are "entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 [admission of threat including gang name against testifying percipient witness].)

Evidence of gang affiliation and activity is admissible where it is relevant to an issue such as motive, intent, the truth of a gang enhancement allegation, or a witness's credibility. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Gardeley* (1996) 14 Cal.4th 605, 619–620; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1450 [witness testified he lied to police, refused to identify defendant, and did not want to testify because he feared retaliation by members of defendant's gang].) However, evidence of a defendant's gang membership generally creates a risk that the jury will improperly infer that the defendant has criminal propensities, acted in accordance with such propensities, and is therefore guilty of the charged offense. (*Williams*, *supra*, 16 Cal.4th at p. 193.) The trial court must therefore carefully scrutinize such evidence because it may tend to inflame the jury. (*Ibid.*) The gang evidence is admissible only if its probative value is

20

not substantially outweighed by the risk of undue prejudice.  (*Ibid.*; Evid. Code, § 352.)

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

Proper application of the rules of evidence ordinarily does not violate due process. (*People v. Cunningham* (2001) 25 Cal.4th 926, 998.)  The admission of evidence may violate due process if there is no permissible inference a jury may draw from the evidence.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1246; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)  The relevant inquiry is whether admission of the evidence in question was so extremely unfair as to violate "'fundamental conceptions of justice.'" (*Dowling v. United States* (1990) 493 U.S. 342, 352 [110 S.Ct. 668].)

**c.     The trial court did not abuse its discretion or violate due process by allowing limited testimony regarding defendants' purported relationship to a gang**

Before the court agreed to admit the limited gang evidence, Lillian was reluctant to identify Anthony and answer certain questions.  She said she was afraid to testify, explaining she was "afraid for [her] life."  Although she had told the 911 dispatcher she did not know who the intruder was, she testified she knew he was Miguel's "younger cousin."  Outside the presence of the jury, she explained her fear was based upon a belief defendants were "related" to a "Mexican gang" and were violent, dangerous people who would "shut people up" "for good."  The extremely limited gang evidence the court admitted was thus highly relevant to Lillian's credibility, in that it explained the inconsistencies between her testimony and the 911 call and her reluctance to testify and to identify the intruder stemmed from fear of retaliation by a gang to which she believed defendants were "related."

The trial court reasonably could have concluded the significant probative value of the limited gang evidence was not substantially outweighed by a risk of undue prejudice and that any risk of prejudice could be eliminated through the limiting instruction and its further instruction explaining the "inherently unreliable" hearsay basis of Lillian's testimony.  We presume jurors follow the trial court's limiting instructions.  (*People v.*

21

*Waidla* (2000) 22 Cal.4th 690, 725.)  Admission of the limited gang evidence was not an abuse of discretion.

Because there was a permissible inference the jury could draw from the limited gang evidence, its admission did not violate due process.

**4.      Failure to instruct on aiding and abetting**

Rodolfo contends the trial court's "sua sponte omission of aiding and abetting instructions" was error that violated his federal constitutional rights to due process and a jury trial.

**a.      Relevant proceedings at trial**

The court and counsel discussed jury instructions off the record.  There is no mention in the record of aiding and abetting instructions or reliance upon an aiding and abetting theory.  The prosecutor argued to the jury, "[T]hese two defendants are, in fact, guilty; . . . they broke into the mobile trailer.  And when they broke into the mobile trailer, it was with the intent to commit theft."

**b.      Pertinent legal principles**

One who knows another's unlawful purpose and intentionally aids, promotes, encourages, or instigates the crime is guilty of that crime as an aider and abettor.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence."  (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.)

Instructional error is subject to harmless error analysis.  Instructional error that does not impair a federal constitutional right requires reversal only if it is reasonably probable that a properly instructed jury would have returned a verdict more favorable to the defendant.  (*People v. Rogers* (2006) 39 Cal.4th 826, 875; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  An instructional error that impairs a federal constitutional right generally is only a trial-type defect and is subject to review under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824]:  The error is harmless if it

appears beyond a reasonable doubt that it did not contribute to the jury's verdict. (*People v. Flood* (1998) 18 Cal.4th 470, 503–504.)

"In determining whether instructional error was harmless, relevant inquiries are whether 'the factual question posed by the omitted instruction necessarily was resolved adversely to the defendant under other, properly given instructions' [citation] and whether the 'defendant effectively conceded the issue' [citation]. A reviewing court considers 'the specific language challenged, the instructions as a whole[,] the jury's findings' [citation], and counsel's closing arguments to determine whether the instructional error 'would have misled a reasonable jury . . .' [citation]." (*People v. Eid* (2010) 187 Cal.App.4th 859, 883.)

### c. Rodolfo was not prejudiced by the failure to instruct upon aiding and abetting

The record demonstrated Rodolfo personally entered the mobile home and stole Cesar's shotgun. Rodolfo's guilt was in no way dependent upon an aiding and abetting theory. Thus, no instructional error occurred with respect to Rodolfo. Alternatively, any instructional error was harmless beyond a reasonable doubt with respect to Rodolfo. Indeed, aiding and abetting instructions would, at best, have provided the jury with an additional theory for convicting Rodolfo.

### 5. On-bail enhancement

Rodolfo contends the trial court relieved the prosecution of its burden of proof regarding the on-bail enhancement by means of a "directed verdict and mandatory instructions on the enhancement's elemental facts." He further contends the court erred by failing to instruct upon the elements of the enhancement, thereby violating his federal constitutional right to a jury trial. The Attorney General opposed these contentions but noted the trial court did not impose, strike, or stay the enhancement. The Attorney General therefore argued this court should remand for the trial court to do something with the enhancement.

We saw a different problem with the enhancement finding and asked the parties to brief the issue of whether sufficient evidence supported the jury's on-bail enhancement finding. In response, Rodolfo contended the on-bail enhancement was not supported by sufficient evidence. The Attorney General argued sufficient evidence supported the finding because the trial court took judicial notice of all the necessary facts and defendant had no federal constitutional right to a jury trial on the enhancement. We conclude the evidence was insufficient to support the jury's finding.

a.      **Relevant proceedings at trial**

The information in the present case alleged Rodolfo had been released on bail or on his own recognizance at the time he committed the burglary charged in this case. (Pen. Code, § 12022.1.)

Before the presentation of evidence began, counsel for Rodolfo moved to "prevent witnesses from the other case" from testifying to establish the on-bail enhancement. He argued the other case was still pending and the "facts on the additional case are, obviously, prejudicial, whatever they are." He further argued, "The fact that there is another case filed is easily proved administratively."

The trial court responded, "Well, I'll just take judicial notice of the open case." Counsel for Rodolfo responded, "Yeah, that will be fine." The prosecutor also agreed to this procedure.

Just before the presentation of the defense case commenced, the court returned to the issue, saying, "This is the out on bail, case No. MA055907. And it reads May 29th of 2012, that he was represented by you, Mr. Gordon. [¶] Bail is set at a hundred thousand dollars. [¶] So I'll tell the jury that the court is taking judicial notice. I'll explain that's a substitute for proof and that, that MA case number, the defendant was on bail on that case." Rodolfo's attorney replied, "All right. [¶] I'm not sure the amount of bail is important." The court agreed it was not.

After the defense rested, the court told the jury, "[Y]ou will recall that when I read to you the allegations of the complaint, I read to you what we call a special allegation.

24

I'm going to reread it now. [¶] (Reading.) [¶] It is further alleged that at the time of the commission of the above offense, referring to the burglary allegation, the defendant, Rodolfo Anthony Vargas, was released from custody or on bail in case No. MA055907. [¶] I am going to take judicial notice of the court's file in that case, MA055907. And I note from the file that bail had been set on that case. [¶] Judicial notice is a substitute for proof, so you must accept those facts as having been proved. [¶] In other words, we're not going to call witnesses to testify to those facts. I'm taking judicial notice of my own file, in other words."

The jury verdict form included a paragraph for the jury to make a finding on the on-bail enhancement allegation, but the trial court did not instruct the jury on the elements of the allegation.

At sentencing neither the court nor any attorney mentioned the on-bail enhancement, and it was not imposed, stayed, or stricken.

### b. Elements of on-bail enhancement

"Any person arrested for a secondary offense that was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years, which shall be served consecutive to any other term imposed by the court." (Pen. Code, §12022.1, subd. (b).) "'Primary offense' means a felony offense for which a person has been released from custody on bail or on his or her own recognizance prior to the judgment becoming final." (Pen. Code, §12022.1, subd. (a)(1).) "'Secondary offense' means a felony offense alleged to have been committed while the person is released from custody for a primary offense." (Pen. Code, §12022.1, subd. (a)(2).)

### c. Insufficient evidence supported the jury's on-bail enhancement finding

The trial court probably intended to take judicial notice of every element necessary to establish the on-bail enhancement allegation. However, it communicated to the jury, as "a substitute for proof" only that "bail had been set on" case No. MA055907. There was no stipulation, judicial notice, or evidence with respect to the remaining

25

elements, i.e., that Rodolfo actually had posted and been *released* on bail and that he had remained on bail in case No. MA055907 on May 1, 2012, the date of the burglary. For all the jury knew, case No. MA055907 could have been dismissed or resolved before May 1, 2012. Rodolfo even could have been released on bail in this case before being charged in case No. MA055907. The trial court, counsel, and this court can determine from a mere comparison of the case numbers that the instant case was filed after Case No. MA055907, but we cannot assume jurors would have known this or even have noticed and compared the case number for the instant case, which they would have seen only on the verdict forms and the cover of the printed jury instructions.

The Attorney General argues the trial court implicitly incorporated by reference every fact necessary to establish the on-bail enhancement in its taking of judicial notice. In support of this theory, the Attorney General cites the court's reading of the enhancement followed by its references to "those facts" in its statements to the jury: "Judicial notice is a substitute for proof, so you must accept those facts as having been proved. [¶] In other words, we're not going to call witnesses to testify to those facts."

Had the court, after reading the enhancement allegation, stated it was taking judicial notice of "those facts," instead of "the court's file," or had the court not specified just one of the several facts relevant to the enhancement, i.e., that bail had been set, the Attorney General's argument might be persuasive. However, the court took judicial notice of "the court's file in that case," then specified a single fact. Notwithstanding the subsequent use of a plural phrase, we conclude the trial court took notice of, at most, the existence of the file and that bail had been set in the other case.

The Attorney General further contends, "[E]ven if the evidence supporting the jury's finding was insufficient, the enhancement should not be stricken, because its truth or falsity is not necessarily a jury question." In support, the Attorney General cites *People v. Johnson* (2012) 208 Cal.App.4th 1092, which held there is no federal constitutional right to a jury trial on an on-bail enhancement under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348]. The issue this court raised, however, was

26

not the propriety of submitting the question to a jury, but the sufficiency of evidence to support the enhancement. The due process requirement of proof beyond a reasonable doubt applies with equal force to a sentencing enhancement allegation (*People v. Tenner* (1993) 6 Cal.4th 559, 566) and does not depend upon whether the trier of fact is a jury or the court. The Attorney General's argument is thus inapposite.

Finally, the Attorney General argues, "[T]o the extent the jury's finding was insufficient, the trial court's own determination was not. The court entered on the record the date bail had been set in the earlier case (May 29, 2012), the amount of bail ($100,000), and the name of appellant's attorney . . . . The trial court had all the information it needed to find the enhancement true." This argument further demonstrates the insufficiency of the evidence supporting the on-bail enhancement: The offense charged in this case was committed on May 1, 2012. Clearly, bail set in the other case 28 days *later* does not support a true finding on an allegation Rodolfo was on bail in the other case at the time he committed the offense charged in this case.

Accordingly, we conclude the jury's finding on the on-bail enhancement was not supported by substantial evidence, and we strike it.

Given our disposition, we need not address the parties' other contentions regarding the on-bail enhancement.

27

## DISPOSITION

The judgment against Anthony Michael Vargas is reversed. The on-bail enhancement finding as to Rodolfo Anthony Vargas is stricken and the judgment against him is otherwise affirmed. The trial court is directed to amend the abstract of judgment as to Rodolfo Anthony Vargas and forward a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.